IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KENNETH PHILLIP PITT IV,

    Plaintiff,

v.                                          Case No.

ROBERT DULLAVIN,

    Defendant.

_____/

## COMPLAINT

COMES NOW the plaintiff, Kenneth Phillip Pitt IV, and complains and alleges against the defendant, Robert Dullavin, as follows.

### NATURE OF THE ACTION

1. This is an action for conversion, breach of fiduciary duty, equitable subrogation, equitable accounting, and breach of contract.

### PARTIES, JURISDICTION, AND VENUE

2. The plaintiff is Kenneth P. Pitt IV. Pitt is a citizen of Florida and a resident of Pinellas County, Florida.

3. The defendant is Robert Dullavin. Dullavin is a citizen of California and a resident of Los Angeles County, California.

4. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states

1

and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5. Dullavin is subject to personal jurisdiction in Florida under Florida Statutes § 48.193 because this action arises out of Dullavin's carrying on a business venture in Florida, committing a tortious act which caused injury in Florida, and breaching a contract in Florida by failing to perform acts required to be performed in Florida.

6. This Court's exercise of personal jurisdiction over Dullavin comports with constitutional due process because Dullavin solicited and formed a joint venture with a Florida resident which joint venture contemplated a continuing relationship between Dullavin and a Florida resident and performance by a Florida resident within Florida of actions in furtherance of the joint venture.

7. Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in this judicial district.

## FACTS COMMON TO ALL COUNTS

8. Pitt has long been in the business of marketing high-end, rare, and collectible athletic shoes and streetwear. Pitt owns Fourth Generation Apparel Inc., which runs a buyers' club for such items. Prior to the formation

of Fourth Generation Apparel, Pitt ran the same buyers' club as a sole proprietorship. Members of the buyers' club include retailers and a number of individual collectors of such items. Members pay a monthly fee in return for preferential opportunities to buy notable merchandise.

9. Pitt uses his expertise in this business to find sources of notable merchandise and offer them to members of the buyers' club. Pitt also uses his access to a pool of likely buyers of merchandise to negotiate favorable arrangements with suppliers.

10. In the niche market for high-end, rare, and collectible athletic shoes and streetwear, counterfeiting is common. Pitt uses his expertise in this business to ensure members of the buyers' club receive only genuine designer shoes and streetwear, not counterfeits.

11. Typically, Pitt will learn of a potential source of supply for a noteworthy shoe or other merchandise and will discuss with the supplier how many pairs of shoes or other merchandise will need to be sold for the supplier to make the shoes or merchandise available to the buyers' club. Pitt will then gauge interest among members of the buyers' club. If there is sufficient interest, Pitt will negotiate for the best possible price and offer the shoe or merchandise to members of the buyers' club. Members will order the shoes or merchandise and pay in advance—normally directly to the supplier. Using

these funds, the supplier will then acquire the shoes or merchandise to fill the buyers' orders. Pitt will inspect random samples to ensure they are genuine, but the supplier will directly fill the orders. Occasionally, Pitt will participate in receiving shoes or merchandise from the supplier and then shipping them to members of the buyers' club.

12. Pitt met Dullavin in November 2020 when Dullavin was an elementary school teacher and Pitt was a seller of high-end, rare, and collectible athletic shoes and streetwear. Dullavin was interested in such shoes and streetwear and was a customer of Pitt's company. Eventually, Pitt hired Dullavin in July 2021 to help manage Pitt's shoe and streetwear company.

13. Also in July 2021, Pitt and Dullavin formed a joint venture in the high-end, rare, and collectible athletic shoe and streetwear business. Dullavin would arrange sources of supply of these shoes, and Pitt would make the members of his buyers' club available as potential customers. Pitt and Dullavin would deal preferentially and almost exclusively with each other in arranging shoe and streetwear deals.

14. The parties used a number of entities in their joint venture. The three principal entities were Fourth Generation Apparel Inc.; Sole Professor LLC; and Backdoor Professor LLC.

15. Fourth Generation Apparel Inc. is a Florida corporation and is 100% owned by Pitt.

16. Sole Professor LLC is a California limited liability company and is 100% owned by Dullavin.

17. Backdoor Professor LLC is an Oregon limited liability company. No operating agreement was ever prepared for this entity, but both Pitt and Dullavin were listed as managers of this entity in its articles of organization filed with the Oregon Secretary of State.

18. Backdoor Professor LLC was intended only to hold a bank account that the parties could use as part of their joint venture.

19. Dullavin established a bank account for Backdoor Professor LLC, but he listed only himself as an authorized signatory on the account.

20. The parties intermixed their finances as part of their joint venture. The parties did not consistently use particular accounts or particular entities for particular purposes within their joint venture.

21. In general, Pitt was entitled to most of the profits associated with running the buyers' club, and Dullavin was entitled to most of the profits associated with particular shoe deals he arranged separately.

22. The parties agreed for some shoe deals, that they would split the profits associated with such deals evenly between the parties.

23. In general, Dullavin was in charge of the finances for the parties' joint venture.

24. Pitt and Fourth Generation Apparel were the central and most significant part of the parties' joint venture. Without Pitt's expertise and buyers' club, the parties' joint venture could not have succeeded.

25. Beginning in October 2021, Pitt and Fourth Generation Apparel used an online payment service called Stripe for the buyers' club members to pay their monthly membership fees. Dullavin set up the Stripe account in October 2021. Dullavin managed the Stripe account and had sole access to the account at all times relevant. While Pitt was generally entitled to the monthly buyers' club fees, the parties agreed that Dullavin would be entitled to 2% of the monthly buyers' club fees.

26. Between September and December 2021, there were problems with a number of shoe offerings arranged by Dullavin.

27. Dullavin arranged one such offering, in September 2021, with a source of supply known as JF Grails. All the shoes supplied by JF Grails in this offering turned out to be counterfeit.

28. Dullavin arranged another such offering, in October 2021, with a source of supply known as Cleveland Turner. The shoes in this offering were

shipped in two shipments. The shoes in the first shipment were genuine, but the shoes in the second shipment were counterfeits.

29. In another offering, members of the buyers' club prepaid a large sum of money for an order of a particular shoe known as a foam runner, but their orders were never fulfilled at all.

30. These orders were made between buyers' club members and Sole Professor LLC or another entity associated with Dullavin.

31. On information and belief, Dullavin deposited all prepayment funds into bank accounts he controlled.

32. Dullavin arranged a number of other shoe offerings in which members of the buyers' club ordered shoes and made large prepayments, but the orders were never fulfilled.

33. Some of these orders were made between the members and Backdoor Professor LLC, and other orders were made between the members and Sole Professor LLC or other entities controlled by Dullavin.

34. On information and belief, Dullavin deposited the prepayment funds for these orders into bank accounts in the name of Backdoor Professor LLC, Sole Professor LLC, or other entities he controlled.

35. When their orders had not been filled in a reasonable time, buyers' club members complained to Pitt, and Pitt attempted to work with Dullavin to ensure the orders were filled or refunds given.

36. In general, Dullavin neither filled the orders nor gave refunds.

37. Dullavin did, however, make refunds to a small number of members who had threatened litigation. These refunds totaled approximately $40,000, which amounted to only a small fraction of the total prepayments.

38. Eventually, Dullavin stopped communicating with Pitt.

39. At all relevant times, Dullavin collected buyers' club membership payments from the members consistent with the parties' joint venture practice.

40. Dullavin did not remit the 98% share of these membership payments to Pitt as required by the parties' joint venture agreement.

41. By January 2022, however, Dullavin stopped remitting membership payments to Pitt altogether.

42. Pitt has demanded that Dullavin remit to Pitt his 98% share of membership payments, but Dullavin has failed or refused to do so.

43. In March 2022, Pitt requested that all the members of his buyers' club cancel their monthly membership payments through the Stripe service

and set up new monthly membership payments that would go to an account controlled by a consultant to Pitt.

44. This harmed the reputation of Pitt's buyers' club and caused Pitt to lose a significant portion of his buyers' club membership.

45. Some members of Pitt's buyers' club failed to cancel their monthly membership payments through the Stripe service, and Dullavin is still collecting these monthly membership payments though he has no right to them.

46. On information and belief, from January to March 2022, Dullavin was regularly—sometimes daily—clearing all membership payments in the Stripe account and transferring them to accounts he controlled.

47. In March 2022, Pitt and Dullavin communicated through a mutual friend and agreed that Dullavin would relinquish to Pitt control of the bank account in the name of Backdoor Professor LLC. The parties further agreed that Dullavin would remit $225,000 to Pitt to allow Pitt to fulfill orders or provide refunds to members. The parties further agreed that Dullavin would cooperate with Pitt in arranging refunds of $209,000 to members who had ordered shoes through Sole Professor or other entities associated with Dullavin. The parties further agreed they would dissolve Backdoor Professor.

48. Pitt acceded to this agreement under duress because Dullavin was holding the membership payments hostage, and Pitt's business was on the verge of being destroyed.

49. Dullavin did not remit to Pitt the $225,000 as required by the agreement.

50. Dullavin remitted only approximately $112,000 to Pitt, and Pitt used these funds to make partial refunds to buyers' club members who had ordered shoes that were never delivered.

51. Dullavin did not cooperate in providing refunds to the members who had ordered shoes through Sole Professor or other entities.

52. The disappointed members continued to complain to Pitt, and Pitt formulated a plan to try to satisfy these members to the extent possible.

53. Pitt requested that the members make a written request for a refund to the entity from which they had ordered their shoes. If the entity did not provide a response within three business days, a member would have to provide some documentary evidence that the member had made a prepayment and requested a refund. At that point, Pitt would then divide what funds he had available ratably between the members requesting a refund. Pitt agreed to make a first round of refund payments on April 14, 2022, and then to make further refund payments thereafter.

54. Pitt made the first round of partial refund payments on April 14, 2022, in the amount of approximately $69,000.

55. On April 20, 2022, Dullavin, through counsel, claimed that Pitt's communications with members regarding the refunds were false and defamatory and demanded that Pitt cease such communications.

56. Pitt made a second round of partial refund payments on April 28, 2022, in the amount of approximately $40,000. Pitt made a third round of partial refund payments on May 12, 2022, in the amount of approximately $69,000. Pitt made an additional, special refund payment in the amount of approximately $30,000.

57. In total, Pitt has made refund payments in the amount of approximately $208,000 to disappointed members of the buyers' club on account of the failed offerings arranged by Dullavin and Dullavin's failure to refund prepayments.

58. Pitt additionally purchased replacement merchandise and offered credits to members of the buyers' club with a total value of approximately $1,592,000 on account of the failed offerings arranged by Dullavin and Dullavin's failure to refund prepayments.

59. Pitt has been forced to incur other costs, such as consulting fees, inventory management costs, logistical costs, and attorney's fees caused by

the failed offerings arranged by Dullavin and Dullavin's failure to refund prepayments.

## COUNT I

## CONVERSION

60. Pitt incorporates the allegations of paragraphs 1 through 59 above as if fully stated herein.

61. Pitt had the right to the monthly membership payments paid by members of the buyers' club, less a 2% share payable to Dullavin.

62. Each monthly membership payment was a specific, identifiable, and stated sum of money, and Dullavin was required to hold such specific sum and to remit it to Pitt less a 2% share which Dullavin was entitled to keep for himself.

63. These membership payments came under the control of Dullavin in his capacity as a member of the parties' joint venture, but the membership payments belonged solely to Pitt—less a 2% share payable to Dullavin.

64. Dullavin wrongfully refused to relinquish these membership payments to Pitt, despite demand by Pitt.

65. By refusing to relinquish the membership payments, Dullavin wrongfully asserted dominion over the property of Pitt inconsistent with Pitt's ownership of such property.

66. Dullavin wrongfully transferred the membership payments into accounts not connected to the parties' joint venture which deprived Pitt of his property permanently or for an indefinite time.

67. Dullavin converted to his own use the membership payments which were then the property of Pitt.

68. The value of the membership payments which Dullavin converted was in excess of $200,000.

WHEREFORE, Pitt demands judgment for damages against Dullavin.

## COUNT II

## BREACH OF FIDUCIARY DUTY

69. Pitt incorporates the allegations of paragraphs 1 through 59 above as if fully stated herein.

70. Dullavin and Pitt stood in a fiduciary relationship with one another by virtue of their joint venture in the high-end, rare, and collectible shoe and streetwear business.

71. Dullavin also stood in a fiduciary relationship with Pitt by virtue of his undertaking to receive the monthly membership payments, deduct his 2% interest, and then remit the payments to Pitt.

72. Dullavin breached his fiduciary duty by failing to account for and remit monthly membership payments to Pitt.

73. Dullavin further breached his fiduciary duty by failing to use his honest efforts to fulfill orders made by members of the buyers' club.

74. Dullavin further breached his fiduciary duty by failing to use his honest efforts to refund prepayments for shoe orders that could not be fulfilled.

75. Dullavin caused damages to Pitt in excess of $200,000 by depriving Pitt of the monthly membership payments to which he was entitled.

76. Dullavin further caused damages to Pitt by forcing Pitt to make partial refunds to buyers' club members in the amount of $208,000.

77. Dullavin further caused damages to Pitt by forcing Pitt to provide replacement merchandise and store credits to buyers' club members with a total value of approximately $1,592,000.

78. Dullavin further caused damages to Pitt by harming Pitt's business relationships with the buyers' club members.

WHEREFORE, Pitt demands judgment for damages against Dullavin, and Pitt further demands judgment imposing a constructive trust on the monthly membership payments wrongfully withheld by Dullavin.

## COUNT III

## EQUITABLE SUBROGATION

79. Pitt incorporates the allegations of paragraphs 1 through 59 above as if fully stated herein.

80. Pitt made refunds to buyers' club members who had prepaid for shoes to be provided by Dullavin, which shoes Dullavin never provided.

81. Pitt made these partial refunds in the total amount of $208,000.

82. Pitt provided replacement merchandise and store credits to buyers' club members who had prepaid for shoes to be provided by Dullavin, which shoes Dullavin never provided.

83. The value of this replacement merchandise and these store credits totaled approximately $1,592,000.

84. Pitt made these partial refunds, provided this replacement merchandise, and provided these store credits to protect his own interest in the buyers' club.

85. Pitt did not act as a volunteer in making these refunds, providing this replacement merchandise, and providing these store credits.

86. Pitt was not primarily liable to the buyers' club members for the partial refunds, replacement merchandise, and store credits.

87. Subrogation would not work any injustice to any party.

WHEREFORE, Pitt demands judgment against Dullavin for equitable subrogation in the amount of $1,800,000, or such other and further amount as may be established at trial.

## COUNT IV

## EQUITABLE ACCOUNTING

88. Pitt incorporates the allegations of paragraphs 1 through 59 above as if fully stated herein.

89. Dullavin and Pitt stood in a fiduciary relationship with one another by virtue of their joint venture in the high-end, rare, and collectible shoe and streetwear business.

90. Dullavin also stood in a fiduciary relationship with Pitt by virtue of his undertaking to receive the monthly membership payments, deduct his 2% interest, and then remit the payments to Pitt.

91. Additionally, the transactions between Pitt and Dullavin are exceedingly complex.

92. An accounting is necessary to require Dullavin to account for, and the Court to determine, the amount of the monthly membership payments Dullavin was required to remit to Pitt.

93. An accounting is necessary to require Dullavin to account for, and the Court to determine, the amounts due to Pitt from the operation of the parties' joint venture.

WHEREFORE, Pitt demands that the Court order an accounting to determine and adjust the accounts of the parties and render complete justice between them, together with such other and further relief as the Court deems just and proper.

## COUNT V

## BREACH OF LIQUIDATION AGREEMENT

94. Pitt incorporates the allegations of paragraphs 1 through 59 above as if fully stated herein.

95. On March 9, 2022, Dullavin and Pitt entered an agreement to liquidate Backdoor Professor LLC. A true and correct copy of this liquidation agreement is attached hereto as Exhibit 101.

96. Under the terms of the agreement, Dullavin was required to make an accounting of all of the assets, liabilities, and net worth of Backdoor Professor LLC immediately following dissolution.

97. Under the terms of the agreement, Backdoor Professor LLC was dissolved on March 9, 2022.

98. Dullavin breached the liquidation agreement by failing or refusing to make an accounting of all of the assets, liabilities, and net worth of Backdoor Professor LLC immediately following dissolution.

99. Under the terms of the agreement, Pitt was to receive funds of $225,000 to complete orders of shoes made by members of the buyers' club, or to provide refunds to such members if the shoes could not be delivered.

100. The $225,000 represented prepayments by members of the buyers' club for shoes ordered but not delivered.

101. Dullavin breached the liquidation agreement by failing or refusing to provide Pitt the $225,000 required by the agreement and instead providing only approximately $112,000.

102. By his breaches of the liquidation agreement, Dullavin has caused damages to Pitt.

WHEREFORE, Pitt demands judgment for damages against Dullavin.

//

//

//

//

//

//

## JURY DEMAND

103. Pursuant to Federal Rule of Civil Procedure 38(b), Pitt demands a trial by jury as to all issues so triable in this action.

DATED: June 30, 2022.

/s/ W. Bradley Russell
W. Bradley Russell
Florida Bar No. 29492
Russell & Russell, Attorneys at Law, P.A.
6550 St. Augustine Road, Suite 305
Jacksonville, Florida 32217
Tel. 904-527-8813
Fax 904-212-0220
Email: brad@therussellfirm.com

Lead counsel for Kenneth Phillip Pitt IV